IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| FRANCIS A. OAKES, III, OAKES FARMS, INC. d/b/a SEED TO TABLE, and SEED TO TABLE, LLC, <br><br>     Plaintiffs, <br><br> vs. <br><br> COLLIER COUNTY, a political subdivision, ANDREW SOLIS, in his official and individual capacities, BURT SAUNDERS, in his official and individual capacities, and PENNY TAYLOR, in her official and individual capacities, <br><br>     Defendants. | CIVIL ACTION <br><br> Case No. 2:20-CV-568 <br><br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>INJUNCTIVE RELIEF SOUGHT</u> |

## <u>VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT</u>

Plaintiffs, by and through their undersigned counsel, and pursuant to the Federal Rules of Civil Procedure and applicable Local Rules, bring this Complaint against the Defendants, and state as follows:

## <u>INTRODUCTION</u>

1. Plaintiffs bring this against Collier County and three County Commissioners for violating local and state law to enact Emergency/Executive Order 2020-05, which holds limited types of businesses liable for both employees and *patrons* not wearing face coverings in their respective establishments. As will be more fully described below, the manner in which this

"Order"[1] was enacted violates the County's own procedures as set forth in its Code of Ordinances, as well as contravenes state law regarding such emergency measures. Moreover, the Order, both on its face and as applied, violates numerous provisions of the State and Federal Constitutions including the right to privacy, equal protection, and due process. In selectively enforcing this Order against Plaintiffs, Defendants have also violated the First and Fourth Amendments to the United States Constitution. Plaintiffs bring this action to redress those grievances and asks this Court to declare the Order null and void and permanently enjoin the County from enforcing it.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 because this is a civil action arising under the laws of the United States, to wit: 42 U.S.C. §1983 and the United States Constitution.

3.      This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

5.       Plaintiff Francis A. ("Alfie") Oakes, III (hereinafter referred to as "Mr. Oakes") is a resident of Collier County, State of Florida. He is the owner of several businesses in Collier County including Oakes Farms Market, Seed to Table, and Food and Thought.

6.      Plaintiff Oakes Farms, Inc. d/b/a Seed to Table (hereinafter "Seed to Table") is a corporation duly organized and existing pursuant to the laws of the State of Florida. Seed to

---

[1] We use the term "Emergency Order" and/or "Order" throughout this pleading for ease of reference because that is the title given to this legislative enactment by Defendants, but this should in no way be construed to mean that Plaintiffs concede that this is the appropriate title or classification.

Table is a full service grocery store including retail grocery, adult beverage service, in-store dining, coffee and ice cream shoppe, and sells other specialty food items, flowers, and produce.

7.     Defendant Collier County (hereinafter referred to as "the County") is a political subdivision of the State of Florida. The County is governed by its Board of County Commissioners, which, by a 3-2 simple majority vote, enacted the Emergency Order that is the subject of this action

8.     Defendant Andrew Solis (hereinafter "Defendant Solis") is a member and current Vice Chairman of the Collier County Board of County Commissioners. Defendant Solis is also an attorney and member of the Florida bar. Defendant Solis is a resident of Collier County, State of Florida.

9.     Defendant Burt Saunders (hereinafter "Defendant Saunders") is a member and current Chairman of the Collier County Board of County Commissioners. Defendant Saunders is also an attorney and member of the Florida bar. Defendant Saunders is a resident of Collier County, State of Florida.

10.     Defendant Penny Taylor (hereinafter "Defendant Taylor") is a member of the Collier County Board of County Commissioners. Defendant Taylor is a resident of Collier County, State of Florida.

## BACKGROUND AND RELEVANT FACTS

### BOARD OF COUNTY COMMISSIONERS DECLARES A LOCAL STATE OF EMERGENCY

11.     On March 16, 2020, the Collier County Board of County Commissioners convened an "Emergency Special Meeting to Discuss Responses to COVID-19 and Consider Declaration of Local State of Emergency".

12.     At this meeting, the County adopted Resolution No. 2020-50 entitled "Proclamation of the Board of County Commissioners, Collier County, Florida, Declaring a Local State of Emergency".   A true and correct copy of Resolution is attached hereto as **Exhibit A** and incorporated herein by reference.

13.     The Resolution correctly states that the County derives its authority to make such a declaration from Section 252.38(3)(a)(5), Florida Statutes and Sections 38-56 and 38-68 of the Code of Laws and Ordinances of Collier County.

14.     Section 38-59 of the Code of Laws and Ordinances of Collier County is not referenced in the Resolution, but nevertheless governs the lawful duration of a local state of emergency. Specifically, Section 38-59 provides, in relevant part, that a "state of emergency shall continue for seven days and may be extended in seven day increments until the Chairman, or Vice Chairman in his absence…finds that the threat or danger no longer exists and/or until an emergency meeting of a quorum of the Board of County Commissioners can take place and terminate the state of emergency proclamation."

15.     Despite the Board of County Commissioners convening for subsequent public meetings on March 24th, March 27th, April 28th, May 12th, May 26th, June 2nd, June 9th, June 23rd, June 30th, July 14th and July 21st, the Resolution has never been extended by any Proclamation, Resolution, or other public, formal action of the Board. Upon information and belief, no extension of the Resolution nor the Local State of Emergency declared by it has occurred. In fact, during the public meeting and prior to the vote on the Resolution, the County Attorney (Jeffrey Klatzkow, Esq.) advised the Board that it did not need to renew the Local State of Emergency every seven (7) days. The minutes of the meeting reflect the following dialogue:

CHAIRMAN SAUNDERS: All right. We have a resolution in front of us. Mr. Klatzkow, based on our conversation and our decisions, does this need to be amended in any way, and –

MR. KLATZKOW: No, I think all your discussions fall within the parameters of the declaration. What we're doing is giving the County Manager some guidance within that timeframe. I'll just note that I've slightly modified it to – just to make clear that we're already operating under a declaration of emergency from the Governor, and the Governor's given you all these powers. So you've got the state emergency, and now you're declaring a local emergency. The Clerk pointed out earlier, County Manager, that your local emergency lasts for seven days. The state emergency, however, is indefinite. So what you're doing – I've modified it so that your actions are both under the local as well as the state so it's indefinite.

CHAIRMAN SAUNDERS: We don't have to come back every seven days to renew this?

MR. KLATZKOW: Yes.

### BOARD OF COUNTY COMMISSIONERS FIRST DISCUSSES - AND REJECTS - THE NOTION OF MANDATING FACE COVERINGS THREE MONTHS AFTER DECLARING A LOCAL STATE OF EMERGENCY

16.     The expiration of the Resolution notwithstanding, on June 23, 2020, the Board of County Commissioners engaged in a discussion regarding what action the County should take in mandating or encouraging the public to wear face coverings when in public to reduce the spread of coronavirus. Specifically, Defendant Saunders asked his colleagues on the Board, "…is there something we could do to encourage more use of masks, not mandate it, but do more?"

17.     In response to this inquiry by Defendant Saunders, Commissioner William McDaniel proposed greater education efforts. Defendant Solis concurred with Commissioner McDaniel's suggestion, stating:

> …I take it that there is no consensus or majority anyway on the Board to move forward with requiring masks. I don't know how it would be enforceable, number one…But I agree, and I like Commissioner McDaniel's idea of potentially using some of those

5

funds if we can, some of the CARE funds, to do social distancing. And I don't know if this falls within the criteria for which we can use it but even, you know, mask distribution if that's –

18.     Defendant Taylor also weighed in on the discussion on this date, stating:

…if a business chooses not to have their employees use masks, then you don't frequent that business. That's the best way to move it….That's a choice. It keeps personal choice here.

…I think there's a difference of opinion out there, as we know, about masks. And, again, I guess my mantra has been, through this whole affair, is it's personal responsibility…

19.     The County Attorney also weighed in on a potential order or ordinance mandating

masks:

I will tell you that enforcing county ordinances is generally through the Code Enforcement Board. My understanding – and Leo can correct me – is the  Code Enforcement Board's not meeting right now. If you wanted to enforce it, it should probably be a misdemeanor of some sort so that the Sheriff can enforce it. That's probably the only meaningful enforcement tactic, and – which is atypical of how we enforce our ordinances...

20. Defendant Saunders then stated:

…I do agree with the Board that we should not be mandating the general  public to be wearing masks. There's a lot of personal responsibility there, but I think we should, as Commissioner McDaniel said, provide more education, provide masks, and perhaps consider whether or not we should be looking at businesses requiring employees to wear masks, and we can do that at the next meeting. If we put that on the agenda, we will have a flood of people saying yes, and we'll have a tremendous flood of people saying no. And so if there's no appetite to even consider that, then I don't think we should even put it on the agenda, because that's just going to create a monster of a meeting. I will kind of poll the Board here to see if we really want to do that.

21.     Thereafter, it was decided that the County Attorney would provide a legal memo

to Defendant Solis, the issue of masks would **not** be placed on the agenda for the following

meeting, but the issue could be brought forward at the next meeting by any Commissioner who

wished to do so. (*See*, Minutes of June 23, 2020 Meeting of the Board of County Commissioners at page 54).

<u>JUNE 30, 2020 MEETING OF THE BOARD OF COUNTY COMMISSIONERS</u>

22.     A "special" meeting of the Board of County Commissioners was convened on June 30, 2020, per the Agenda, "to consider policy and operational issues relating to COVID-19".

23.     At this meeting, the Board heard from representatives from the Department of Health and the two regional hospitals.

24.     It was reported to the Board by Scott Lowe of Physicians Regional Hospital that there were 42 COVID-19 patients in the hospital that morning, which was up from the average of 25-30 patients they had been seeing daily consistently during the month of June.

25.     Mr. Lowe further reported that there were only 1 or 2 COVID-19 patients on ventilators and that a lack or potential lack of ventilators and/or Intensive Care Unit beds was not an issue.

26.     NCH Healthcare System representative John Kling reported to the Board that between their two campuses, there were a total of 93 COVID-19 patients that morning. He testified that there had been a steep increase in the COVID hospitalizations over the last ten days. However, he further informed the board that the overall "census" or occupancy at the hospital was not different from this time last year or prior years.

27.     Mr. Kling further advised the Board, "…from the start of this, we had 11 percent admission rate for COVID positive patients. Now with all of the increased testing, we're actually down to 8 percent…".

28.     Finally, Mr. Kling reported to the Board that of the 93 hospitalized COVID patients, only 12 were critical care, and 5 of the 12 were on ventilators. He further elucidated the situation, saying, "we're seeing a huge shift from the beginning of this pandemic from ICU needs and ventilator needs to more of a med-surg kind of a quick turnaround stay…"

29.     In response to questioning by Commissioner McDaniel, Mr. Kling reported that the hospital has a 715 bed capacity and currently had 465 occupied beds. Mr. King further reported that they have the ability to increase bed capacity, as needed.

30.     After the reports by the local hospital representatives, Defendant Saunders stated that the Board was going to discuss what to do regarding the beaches for the upcoming July 4th weekend and whether the Board was going to consider some sort of mandatory mask ordinance.

31.     Commissioner McDaniel pointed out that there was no public notice given that there would be a discussion about or consideration of a mask mandate.

32.     Defendant Saunders retorted that the agenda noticed "consider[ing] policy and operations issues related to COVID-19", and that was sufficient to notify the public regarding a possibly mandatory mask ordinance.

33.     The Board proceeded with the discussion about a possible mandatory mask ordinance.

34.     The County Attorney pointed out:

> There are certain enforcement issues with respect to this. You have an ADA issue where if you have a breathing issue, you don't need to wear a mask, but you really can't inquire as to a person as to what their real issue is. So, there's a general enforcement issue on masks.

35.     The County Attorney also referenced the procedural requirements for implementing such a mandate:

> There are numerous issues that are going to get raised, including the procedure that's been utilized. The general rule is that you need to advertise an ordinance for 10 days, then you need majority support for that. An emergency ordinance, you can generally do, but it requires four votes…The governor has not  authorized use of a mask, so you've got that as an issue. Whether or not a local jurisdiction has the power to do this is going to be another issue…

36.     Defendant Taylor then weighed into the discussion, referencing a conversation she previously had with the County Attorney, stating, "It's my understanding from the county attorney that enforcement must be throughout *(sic)* the sheriff's department. It cannot be a code violation."

37.     Defendant Solis was the only member of the Board who expressed theoretical support for a mandatory mask ordinance at the June 30, 2020 meeting although he, like his colleagues on the Board, acknowledged that the enforceability of such a mandate would be problematic.

38.     Towards the end of the meeting, Defendant Saunders made a motion for "a strongly worded resolution urging the public to wear masks whenever social distancing is not possible indoors…" This was to be in lieu of a mandate.

39.     Resolution No. 2020-110 "Encouraging the Use of Face Coverings in All Collier County Government Buildings Due to the Coronavirus Disease (COVID-19)" passed unanimously. As is able to be gleaned from the title of the Resolution, this did not contain a mandate of any kind.

40.     Apparently discontented with the outcome of the June 30, 2020 meeting, Defendant Solis set out on a course of conduct aimed at coercing the Board and, hence, the County, to take action according to his wishes.

### DEFENDANT SOLIS AND THE TOURIST DEVELOPMENT COUNCIL

41.     As stated on the County's website, the Tourist Development Council (hereinafter "the TDC") is a nine member council created by Ordinance No. 92-18 "to meet monthly to make recommendations to the Board of County Commissioners regarding a proposed plan of uses for tourist development tax revenues, for the effective operation of the special projects or uses of the tourist development tax revenues, and to review all expenditures of revenues from the tourist development trust fund".

42.     By ordinance, one member of the Board of County Commissioners is to sit on the TDC. Defendant Solis currently sits on the TDC in this capacity and, in fact, is presently the Chair of the TDC.

43.     Defendant Solis called a special meeting of the TDC following the June 30, 2020 meeting of the Board of County Commissioners discussed above. This special meeting was held on July 8, 2020.

44.     Per the meeting Agenda, this special meeting of the TDC was held solely regarding a "Recommendation to Consider Requiring Face Coverings in Public Areas and Inside Businesses in Collier County, and make a finding that this item promotes tourism". Such a discussion and finding is wholly outside of the lawful scope of the TDC.

45.     The published minutes of the July 8, 2020 TDC meeting reflect that all but one[2] of the public speakers who spoke at the meeting opposed the TDC recommending that the Board of

_____

[2] Curiously, the one individual identified as having spoken in support of the mandating of wearing face coverings at the TDC meeting spoke in opposition to mandatory face coverings at the Board of County

County Commissioners mandate the wearing of face coverings in any setting and that many of the members of the TDC questioned whether the mandating of face coverings would help or harm business and tourism, and preferred that it be left to the individual businesses to decide whether to require face coverings in their respective establishments.

46.     After a few revisions, ultimately the TDC approved by 4-3 vote a motion worded as follows:

> That the Tourist Development Council move the issue to the Board of County Commissioners to request that the benefit of requiring masks be further vetted and considered as a solution or part of the solution to the increasing spread of COVID-19 and decreasing TDT revenues.

JULY 14, 2020 MEETING OF THE BOARD OF COUNTY COMMISSIONERS

47.     July 14, 2020 was the next scheduled (regular) meeting of the Board of County Commissioners.

48.     Item 10E on the Agenda for the July 14, 2020 meeting was a "Recommendation that the Board direct the County Attorney to advertise and bring back for a Special Hearing an Ordinance mandating that individuals wear a face covering in public". The Agenda also indicates that this item was brought forth by Defendant Solis.

49.     The discussion of item 10E was preceded by a presentation by the Department of Health. Some noteworthy remarks made by the Department of Health representative at that meeting include:

> On the percentage of positive cases, it appears to have a downward trajectory... we've been holding 16 percent for about four weeks, which is still well above the target range of 10 percent...The rate of increase for COVID cases, new cases, from the 14th to the 28th was 67 percent, June 14th to 28th; and for the last two weeks, June 28th to July 12th , also 67 percent rate of increase...Hospital rate of

---

Commissioners meeting. Upon information and belief, this individual's position on the issue is erroneously reflected in the TDC minutes.

> increase for hospital admissions was 37 percent…June 14th through 28th. And these past two weeks, the rate of increase…a little bit lower, 35 percent.

50.     Following the Health Department's report, Defendant Saunders called upon Defendant Solis to introduce item 10E.

51.     Defendant Solis proceeded to talk about his recent meeting of the TDC, saying:

> …[I]t was incumbent upon me to bring this to the TDC and have a discussion as  to, one, from a marketing perspective, what do we want to do?...[I]s not having a mask ordinance putting us at a disadvantage to the areas that we compete with every day for tourism dollars. And the TDC voted that – to bring this forward to the County Commission.

52.     Defendant Solis then proceeded to give his own presentation about COVID-19 and masks as a protective measure, which presentation included various anecdotal accounts as to their effectiveness.  This information was not provided to the other Board members or the public prior to the meeting, nor was it ever provided to County staff for purposes of verifying the accuracy of the information or otherwise engaging in further fact-finding and information gathering.

53.     Perhaps most outrageously, Defendant Solis mischaracterized the outcome of the TDC meeting:

> The discussion we had at the TDC was that this is something that could be helpful, would be helpful to our businesses of all types if Collier County was known to be now taking the steps to make sure that we are the best and safest place to come, not the opposite, which is what we are seeing in the media.

54.     After Defendant Solis concluded his presentation, Defendant Saunders requested of his colleagues, "that we do this as an emergency order, because we could do that today…As opposed to continuing this for another two weeks to advertise."

55.     In response to this request, Defendant Solis expressed concern about the number of votes required to enact something on an emergency basis, to which Defendant Saunders responded, "An emergency order only requires a simple majority. An emergency ordinance requires a supermajority."

56.     Commissioner McDaniel made two important (and relevant for purposes of this Complaint) points in response to Commissioner Solis' presentation. First, he noted that there has been no data actually presented on the impact or potential impact on the local economy of not enacting a mask mandate.

57.     Commissioner McDaniel further pointed out the counter-intuitiveness of taking this action purportedly to incentivize tourism while simultaneously restricting beach access[3] so as to deter people from coming to the area.

58.     The Board of County Commissioners heard from over 200 people on this agenda item.

59.     After the conclusion of the public comment period, Defendant Solis stated (in relevant part):

> …[A]ttached to the executive summary was a draft of an ordinance that our County Attorney put together…I think that what we're here today to do is to decide whether to direct the County Attorney to bring one back for a special hearing if it's going to be an ordinance. But I know the Chairman, you had mentioned that there's a possibility of doing this as an emergency order.

60.     Upon receiving confirmation from Defendant Saunders that an emergency order mandating that residents wear face coverings in public could be adopted that day with three affirmative votes, Defendant Solis made the motion to adopt the already-drafted ordinance as an emergency order.

---

[3] At the June 30, 2020 meeting, the Board of County Commissioners directed the County Manager to close the beaches from 11a-5p Friday through Sunday to deter people from out of town from coming here.

61.     After proposing certain revisions that Defendant Solis subsequently assented to,

Defendant Saunders seconded the motion.

62.     Among the revisions discussed was the method of enforcement and, specifically,

the expressed desire to take that enforcement away from the Sheriff.  Defendant Saunders stated:

> [W]e heard some testimony some time ago from our law
> enforcement folks  that there appeared to be some reluctance to
> enforce this type of an ordinance from a criminal standpoint. I
> think that a $500 penalty and a jail time of up to 60 days, I think
> we're criminalizing this, and I'd like to find a way for it to be not a
> criminal offense but a civil penalty as opposed to -- and that would
> eliminate our law enforcement from having to be the enforcement
> mechanism.  So that will eliminate one level of contact between
> law enforcement and the public. Now, that begs a question is: How
> do you enforce it?  And I think perhaps, you know, this could be a
> code enforcement violation. That becomes very difficult to
> enforce. But I think what we -- I think what we're doing -- and I'm
> suggesting this to my colleagues on the Board that are opposed to
> this, that if this is a civil violation, clearly enforcement will be very
> difficult. There's no question about that. If it's a criminal violation,
> enforcement's going to be very difficult as well, but at least we
> eliminate the law enforcement contact.

63.     The County Attorney again advised the Board:

> You can do this by an emergency ordinance, but that requires at
> least four votes, all right…That's one way to do it…If you have
> four votes up there that would be the preferred method…Your
> secondary method of doing this is an emergency order under a
> different statute. At that point in time, that would require only
> three votes. The legal underpinnings for an emergency ordinance
> are stronger than they are for the legal underpinnings of an
> emergency order, but you can do both.

64.     t was also noted that this proposed order did not limit the mandate requiring face

coverings to only situations in which social distancing (i.e., standing at least 6 feet away from

any other person) is not possible.  The matter was then opened up for discussion by the other

Commissioners.

65.     There was no further public comment permitted on the amended Order/Ordinance following the amendments.

66.     Defendant Taylor stated:

> So now the Board of County Commissioners are going to start fining businesses that are trying to get – survive in the COVID times.  I cannot support a mandate, and I cannot support fining our businesses at this time.

67.     Commissioner McDaniel expressed concern about "the right of privacy for our citizenry. We're not allowed to ask about health issues when we're hiring somebody…there are ADA rules that are -- that are against acquiring this kind of information and/or -- and/or these kind of mandates. So we haven't even got over into that aspect of it yet from a violation of privacy standpoint…"

68.     Ultimately, the Board voted down the Ordinance, with Defendants Solis and Saunders voting in support and Defendant Taylor along with Commissioners Donna Fiala and William L. McDaniel, Jr. voting in opposition.

<u>DEFENDANT TAYLOR REVERSES COURSE SIX DAYS LATER</u>

69.     On Monday, July 20, 2020, shortly before 10 a.m., Defendant Taylor sent an email to the County Manager "requesting an emergency meeting be called to reconsider Item 10.E. on the 7-14-20 agenda". She cited "a change of heart regarding the mask issue" as the basis for her request.

70.     Sometime that day, a special meeting of the Board of County Commissioners was scheduled for the following day, July 21, 2020, at 9.a.m.

<u>JULY 21, 2020 MEETING OF THE BOARD OF COUNTY COMMISSIONERS</u>

71.     On less than 24 hour notice, the Board of County Commissioners convened an "Emergency Meeting to Discuss the Wearing of Face Coverings in Public Places" (per the published Agenda).

72.     Agenda item 2.A. was "Reconsideration of Item 10E from the July 14, 2020 BCC Meeting titled: Recommendation that the Board direct the County Attorney to advertise and bring back for a Special Hearing an Ordinance mandating that individuals wear a face covering in public."

73.     First, the Board heard from a representative of the Health Department. The representative reported that "on July 20th…NCH had 14 COVID patients in ICU beds, and 17 beds still available" and "110…COVID patients in non-ICU beds, and they have 85 staffed and available beds they could put more patients into." He further reported that Physicians Regional Hospital had "just under 20…COVID patients in ICU…and about 60 COVID patients in their non ICU beds." He further reported that the rate of increase of COVID patients was down to 61 percent from 67 percent over the prior two week period.

74.     Defendant Saunders then turned the meeting over to Defendant Taylor to start the discussion regarding the item she asked be reconsidered by the Board. She explained:

> So, the day of our meeting, which was July the 14th, at the end of that meeting, I read the press release from the CDC calling on Americans to wear masks to prevent COVID-19 spread.[4] I also read the press release that talked about the two hairdressers from Missouri who were wearing masks, working with COVID, and their clients – not one of their clients got infected.[5] But when their

---

[4] The CDC began making this recommendation as early as April 3, 2020.
https://www.npr.org/sections/coronavirus-live-updates/2020/04/03/826219824/president-trump-says-cdc-now-recommends-americans-wear-cloth-masks-in-public

[5] This story was reported on June 11, 2020 (https://www.cnn.com/2020/06/11/us/missouri-hairstylists-coronavirus-clients-trnd/index.html). The article states that "[o]f the 140 clients and seven co-workers

– later on when they tested their families, their families were infected.  So, these two hairdressers were definitely contagious, but the masks not only protected them, it protected their clients, because the clients were wearing masks. So, there was a study that I was waiting for that I had asked for last Tuesday. But then I started hearing about different stores. And I made a list here. So just bear with me. I'm going to read through this list about what is happening nationally. After July the 14th, 2020, Winn-Dixie; Bed, Bath & Beyond; Best Buy; CVS; Gap and all its affiliates; Harris Teeter; Home Depot; Kohl's; Lowe's; Panera Bread; Target; Walmart; Amazon and all its affiliates, including Wholefoods, excuse me; Kroger; Aldi; Macy's; Starbucks; Albertson's; Rite Aid; and Pet Smart are mandating masks to enter their stores.[6] Our local businesses are very concerned, not for today. They are concerned about what is going to happen in October or November when folks come back from the north to escape the cold, to enjoy our climate, to live in their houses…I've had two Zoom calls with major retailers throughout our community talking about what we can do together -- together, government with these businesses, to get the word out that we're a very, very safe community. Our local businesses are very concerned, not for today. They are concerned about what is going to happen in October or November when folks come back from the north to escape the cold, to enjoy our climate, to live in their houses. And they are concerned that there is a lack of safety in their minds that they feel afraid.…One of the issues that it's very clear -- and if we put the map up, sir -- is that when you look at the states that have statewide mask mandates, you can see that the northeast is one of those areas… in tourism, we appeal to the northeast. You realize that those folks up there expect the same of us…

75.     The Board of County Commissioners then took public comment. The overwhelming majority of commenters opposed the proposed Order.

76.     The Board then resumed discussing the matter amongst themselves. Defendant Taylor stated that the rate of infection on June 9, 2020 was 9.9 percent but on July 21, 2020 was

---

potentially exposed, 46 took tests that came back negative." The article does not discuss the stylists' family members.

[6] Nearly all of these retailers have since announced that they will continue to serve customers not wearing face masks. https://www.cnn.com/2020/07/24/business/masks-walmart-home-depot-lowes-cvs/index.html

15.63 percent.[7] She stated that her office had just compiled this information after being confronted by the public with questions about why the County was considering this action for the fourth time after rejecting such a mandate on three prior occasions.

77.     Defendant Solis then proposed that the County set a six week timeframe for the Order to sunset. Defendants ultimately selected September 3, 2020 as the expiration date because that is the date of the next scheduled meeting of the Board of County Commissioners.

78.     Defendant Solis then moved to adopt Emergency/Executive Order 2020-05.

79.     Defendants and the County Attorney also decided that the three cities within the County - City of Naples, Marco Island, and Everglades City - would not be included in the Order but would have the option of "opting in".[8]

80.     Defendant Saunders then seconded the motion.

81.     Commissioner McDaniel was given the opportunity to speak next and made the following statement (in part):

> If you've been listening to yourself while you've been discussing this ordinance, every single rationale that you have come up with to promote and pass this ordinance has been arbitrary…You picked an arbitrary date to sunset the ordinance. You picked an arbitrary methodology of allowing for enforcement of the ordinance. We have not seen any good data. You brought us back…a week ago, Commissioner Solis, after you convened a meeting of a voluntary organization that you were appointed to by our board to give us advice on the expenditure of our TDT dollars, our tourist development dollars, to garner support for your ordinance, and I thought that was – that was a rather  interesting move on your behalf. It was a bit of a reach, candidly…You provided no real data other than anecdotal that Collier County was operating at a deficit for tourist dollars…

---

[7] This contradicts the information presented by the Department of Health at the prior meeting of the Board of County Commissioners.

[8] On July 29, 2020, the Naples City Council voted against opting-in to the County mandate that is the subject of this litigation. This means that visitors and residents of Collier County will not be required to wear masks while in City of Naples. Downtown Naples and the Historic District - which are arguably the portions of Collier County most frequented by tourists - are located within the confines of the City.

I have served on this board with you folks for three-and-a-half years. I have watched you methodically move through the process, hear every single side, deploy our staff to gather information, bring us data. The one thing we can all singularly agree is we don't have enough data. We haven't deployed our staff…Have we heard from any of our staff about the communities that surround us, Miami-Dade and Broward, Orlando, Orange County, Tampa, Pinellas…they have all had face mask mandates for quite some time. Have we heard about their county with positivity? From anybody? No. Have we heard about their increase or decrease in hospitalizations from anybody? No. Have we heard about the fatalities?

82.     Commissioner McDaniel then requested that the Board "continue this item, we deploy our staff to go gather data from assured sources as much as is possible, to come back and allow us to actually have a discussion with what I consider to be real data and comparison as to what's, in fact, going on."

83.     Commissioner McDaniel further opined that the hearing on the matter should be held in the evening when the majority of residents are able to attend, and that people must be given more than 24 hour notice so they have an opportunity to appear and be heard.

84.     Defendant Saunders argued that in Asian countries wearing a mask is commonplace and America can learn from those countries because those countries have effectively contained the spread of the virus and enabled their economies to reopen more quickly. There was no expert testimony or other evidence on this presented at the hearing.

85.     Defendant Saunders went on to say that we need herd immunity, which will not be accomplished without a vaccine. There was no expert testimony or other evidence on this presented at the hearing.

86.     Defendant Solis said in response to Commissioner McDaniel's comments, "we've heard all sorts of data, and we pick and choose -- you pick yours. We pick ours…The Department of Health is here to advise us. And the CDC is our experts."

87.     Defendant Solis again referenced a decline in tourism revenues, completely disregarding the economic shutdown and its unavoidable effects on all businesses.

88.     Defendants Solis, Saunders, and Taylor voted to approve Emergency/Executive Order 2020-05, with Commissioners McDaniel and Fiala voting in opposition thereto.

89.     Curiously, the Order – which is annexed hereto as **Exhibit B** and incorporated herein by reference - is dated July 14, 2020.

<u>PROGRESSION OF COVID-19 VIRUS IN COLLIER COUNTY</u>

90.     The dashboard maintained by the Florida Department of Health has the total cumulative case count for Collier County as 8,795 as of July 26, 2020[9].

91.     The same dashboard reflects the total death count for Collier County as 117.

92.     The same dashboard reflects the total number of persons requiring hospitalization as 612.

93.     The United States Census Bureau estimates the total population of Collier County, Florida as of July 1, 2019 as 384,902. It is undisputed that the population has grown since that time.

94.     Assuming *arguendo* the accuracy of the numbers provided by the Department of Health[10], these numbers mean that .03 percent of the total population of Collier County have died with (not necessarily from) the COVID-19 virus, 2.3% of the total population have contracted

---

[9] This is the date when this portion of the Complaint was drafted. All of the numbers recited in this section reflect the counts as of that date unless otherwise stated.

[10] There have been many reports – and even admissions – that the numbers are inflated due to inaccurate reporting.

the COVID-19 virus, and 98.67% of those who have contracted the COVID-19 virus have recovered from it.

95.     Moreover, at no time have any of the hospitals in Collier County, nor neighboring Lee County, reached full capacity such that they were unable to provide care to any person requiring hospitalization due to COVID-19 or any other illness.

96.     Notably, according to the dashboard numbers, only 6.7% of persons reported as having contracted the virus in Collier County required hospitalization.

97.     There is limited information provided on the dashboard tracking day-by-day or even week-by-week changes in the numbers. The dashboard does, however, provide daily numbers on positive tests. On July 13, 2020, there were 286 new cases reported. On July 20, 2020, there were 143 new cases reported. In other words, there was a 50% reduction in new cases on the day when Defendant Taylor had a "change of heart" and called an emergency meeting to enact the mandatory mask order versus the day before the meeting where she opposed the very same order.

98.     The dashboard reflects a peak in documented new cases on July 12, 2020 with 1,516 new cases reported that week, which dropped to 987 by the week of July 19, 2020.

99.     The dashboard also displays a graph showing the percent of positive laboratory tests, which was highest on June 28, 2020 at 18.83%, and progressively fell to 16.97% on July 5, 2020, 15.3% on July 12, 2020, and 12.82% on July 19, 2020 (the last date reported as of the date of this Complaint). This contradicts the information presented by Defendant Taylor at the July 21st meeting.

COVID-19 RESPONSE FACTS

100. The guidelines promulgated by the State of Florida for safe re-opening specifically states, "Measures taken by the government must not impair the fundamental rights of Floridians, and when restrictive measures are imposed they should be the least restrictive measures feasible to accomplish a specific medically necessary objective."

101. Although recommended, neither the U.S. Center for Disease Control nor the Florida Department of Health (nor the federal nor state governments which these agencies respectively serve) have issued mandates requiring persons to cover their faces while in public.

THE EMERGENCY/EXECUTIVE ORDER
AND CONFLICTING LAWS

102. Emergency/Executive Order 2020-05 reads (in part):

**SECTION TWO: DEFINITIONS**

For purposes of this Order, the following terms are defined as follows:

(1) Face Covering. A " face covering" is a material that covers the nose and mouth. It can be secured to the head with ties or straps or simply wrapped around the lower face. It can be made of a variety of materials, such as cotton, silk, or linen. A cloth face covering may be factory-made or sewn by hand or can be improvised from household items.
(2) Business establishment. A "business establishment" means a location with a roof overhead under which any business is conducted, goods are made or stored or processed or where services are rendered. The term " business establishment" also includes locations where non- profit, governmental, and quasi-governmental entities facilitate public interactions and conduct business. The term does not include schools servicing students under the age of 18, or places of worship.
(3) Lodging establishment. A " lodging establishment" shall have the same meaning as the term "transient public lodging establishment" has in F.S. 509.013(4)(a) 1 (2019). A lodging establishment is a specific type of business establishment.

## SECTION THREE: MANDATORY REQUIREMENTS

(1) An owner, manager, employee, customer or patron of a business establishment must wear a face covering while in that business establishment.

(2) The requirements of this section do not apply to:

a. Restaurant customers or patrons while dining and/ or consuming beverages while seated at a table;

b. A gym patron engaged in a workout or class where at least 6 feet of distancing exists with the next closest patron;

c. Barbershop or beauty salon customers or patrons when wearing a face covering would reasonably interfere with receiving services;

d. Business owners, managers, and employees who are in an area of a business establishment that is not open to customers, patrons, or the public, provided that 6 feet of distance exists between employees. This exception does not apply to employees who are present in the kitchen or other food and beverage preparation area of a restaurant or food establishment. When an owner, manager, or employee is in their place of employment but not within six feet of another person, that owner, manager, or employee does not need to wear a mask.

e. Bar patrons while consuming beverages and/ or food;

f. A lodging establishment guest when inside of the lodging unit including but not limited to a hotel room, motel room, vacation rental unit, timeshare unit, or similar unit.

(3) The owner, operator, manager, and employee of a business or lodging establishment shall ensure that every individual in that establishment complies with this section.

(4) When a customer of a business establishment asserts that he or she has a disability that prevents the individual from wearing a mask, the owner, manager, or employee of the business establishment may exclude the individual, even if they have a disability, as they may pose a direct threat to the health and safety of employees and other customers, even if asymptomatic, and shall accommodate the disabled individual in a manner that does not fundamentally alter the operations of the business establishment nor jeopardize the health of that business' s employees and other customers, such as providing curb service or delivery or other reasonable accommodation.

## SECTION FOUR: PENALTIES AND EXCLUSIONS.

Violations of this Order shall be punishable by a fine not to exceed $500.00. An owner, manager, and/ or employee of a business establishment shall not be liable in any enforcement action taken under this section for the violations of a guest, customer, and/ or

patron if that owner, manager, and/or employee directed that guest, customer, and/or patron who refuses to wear a face covering to vacate the premises or face prosecution of trespass. This Order shall not apply to a child is under nine years of age; an individual has one or more medical conditions or disabilities that prevent wearing a face covering; an individual obtaining a service involving the nose or face for which temporary removal of the face covering is necessary to perform the service; or an individual who works in a profession where use of a face covering will not be compatible with the duties of the profession.

**SECTION FIVE: SEVERABILITY.**

In the event this Order conflicts with any Ordinance of Collier County or other applicable law, the more restrictive shall apply. If any court of competent jurisdiction holds any phrase or portion of this Order invalid or unconstitutional, such portion shall be deemed a separate, distinct and independent provision and such holding shall not affect the validity of the remaining portion.

**SECTION SIX: APPLICABILITY.**

This Order is intended to apply solely within unincorporated Collier County. Any of the Municipalities within Collier County may opt-in to this Order.[11]

**SECTION SEVEN: EFFECTIVE DATE.**

This Order shall take immediate effect immediately and shall be in full force and effect and shall expire midnight of September 3, 2020, unless otherwise extended by the Board.

<u>Enforcement by Businesses</u>

103.    Section Three, subsection (3) of the Order puts the onus on a business owner/operator/employee to "ensure that every individual in that establishment wears a face covering".

---

[11] County Consolidated Code Enforcement Order No. 2007-44 does not actually allow for the piecemeal "opting in" to a particular local regulation such as the Order. Rather, Article I, Section 2 of Ordinance 2007-44 states that the municipalities may elect to have the entirety of the code enforcement ordinance apply to those municipalities.

104.    Section Three, subsection (4) states that if a customer "asserts" a disability that prevents an individual from wearing a mask, the business (including owner, manager or employees) is required to exclude (i.e., prohibit) the customer from entry, and instead provide "curb service or delivery or other reasonable accommodation."

105.    Section Four of the Order states that "an individual [that] has one or more medical conditions or disabilities that prevent wearing a face covering" is exempt from the Order, and, presumably, may enter the business without wearing a mask.

106.    The Order provides no guidance on how a retail business with no medical expertise is to differentiate between those customers who "assert" a disability, and must be denied entrance, and those customers who actually have a disability, and must be granted entrance.

107.    The Order also does not provide guidance regarding against whom the Order should be enforced as between the "owner," "manager," and "employees" of the business who may (or may not) be present at the time of any illegal entry of the business by customers not wearing masks.

108.    Public lodging establishments and public food service establishments are private enterprises, and the operator has the right to refuse accommodations or service to any person who is objectionable or undesirable to the operator, but such refusal may not be based upon race, creed, color, sex, pregnancy, physical disability, or national origin. A person aggrieved by a violation of this section or a violation of a rule adopted under this section has a right of action pursuant to s. 760.11. Fla. Stat. § 509.092.

109. Further, Title III of the Americans with Disabilities Act provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182(a).

110. Title I of the Americans with Disabilities Act prohibits an employer from discriminating against an employee in hiring, firing or other conditions of employment based on a disability. This includes, "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112.

111. The prohibition against discrimination…include[s] medical examinations and inquiries. 42 U.S.C. § 12112.

112. The Order provides no guidance on how a business owner is to comply with the Order, while at the same time complying with, and not becoming subject to liability under, the ADA.

<u>Enforcement and Penalties under the Order</u>

113. The Order has its own penalty provision (fines up to $500.00), but Section 38-70 of the Collier County Code of Ordinances actually prescribes the penalty for violations of any and all Emergency Orders, to wit:

Any person violating any provision of this Emergency Management Code or any rule or order made pursuant to this Emergency Management Code is guilty of a misdemeanor of the second degree, punishable as provided in F.S. §§ 775.082 or 775.083. Each day of continued noncompliance or violation shall constitute a separate offense. In addition to the foregoing, any licensee  of the County found guilty of violation any provision of this Ordinance, or the emergency measures which may be made

effective pursuant to this Ordinance, may have his license
suspended or revoked by the Board of County Commissioners.

114.    The individually named County Commissioner Defendants purportedly

established a civil enforcement scheme for the Order through its Code Enforcement Division, but

the Order itself dictates, "In the event this Order conflicts with any Ordinance of Collier County

or other applicable law, the more restrictive shall apply."

115.    Thus, violation of the Order is necessarily a misdemeanor, which is a criminal

offense, and therefore cannot be enforced by Code Enforcement (Collier County Code of

Ordinances Section 2-2003). This is contrary to the letter of the law and the stated intent of the

Commissioners to avoid criminality and to exempt the Sheriff from involvement, particularly

since the Sheriff asserted that such enforcement would be problematic.

116.    Because of the conflict between the Order and Code of Ordinances Section

2-2003, the Plaintiffs are uncertain as to the nature of any violation under the Order, and which

agency (i.e., Code Enforcement Department or Sheriff) has the jurisdictional authority to enforce

the Order at Plaintiffs' places of business.

<u>ENFORCEMENT OF THE ORDER AGAINST OAKES FARMS</u>

117.    On July 24, 2020, Collier County Code Enforcement Investigator Letourmeau

issued a Notice of Violation to Seed to Table, which alleges a violation of Section 3, Subsection

1 of the Order, to wit: "[A]n owner, manager, customer, employee, customer or patron of a

business establishment must wear a face covering while in that business establishment." The

factual allegations are limited to, "Numerous patrons/customers and employees of Seed to Table

inside the store without proper face coverings."

118.    On July 27, 2020, Investigator Letourmeau issued a Collier County Citation to

Seed to Table, LLC, assessing a $105 penalty for alleged failure to comply with Section 3,

Subsection 1 of the Order. The factual allegations are limited to, "Numerous customers and employees without required facemasks."

119.    On July 27, 2020, Investigator Letourmeau issued a Notice of Violation to Oakes Farms Market, which alleges a violation of Section 3, Subsection 1 of the Order, to wit: "[A]n owner, manager, customer, employee, customer or patron of a business establishment must wear a face covering while in that business establishment." The factual allegations are limited to, "Numerous patrons/customers and employees of Oakes Farms inside the store without proper face coverings."

120.    In the early morning of July 29, 2020, Oakes Farms placed "POSTED" signs at its store entrances, placing the County's Code Enforcement officers on notice that they are prohibited from entering the premises without a warrant, and that any unauthorized entry shall be deemed a trespass.

121.    Later in the day on July 29, 2020, the County's Code Enforcement officer(s) ignored the signage described above, entered the interior of Oakes Farms' premises, and proceeded to conduct a search of the premises.

122.    Also on July 29, 2020, Investigator Letourmeau issued another Collier County Citation issued to Seed to Table, LLC, assessing a $255 penalty for alleged failure to comply with Section 3, Subsection 1 of the Order. The factual allegations are limited to "Employees & Patrons without Proper Face Coverings inside the Seed to Table Store."

123.    On July 30, 2020, Investigator Letourmeau issued a Collier County Citation to Oakes Farms Market, LLC, assessing a $105 penalty for alleged failure to comply with Section 3, Subsection 1 of the Order. The factual allegations are limited to, "Multiple Employees and Patrons not wearing face coverings inside the Oakes Farms Market."

124.    Upon information and belief, the County's Code Enforcement officer did not have a warrant to enter any of the premises described above on any of the dates they are known to have entered in and upon the premises.

## LEGAL ALLEGATIONS

AS AND FOR A FIRST CAUSE OF ACTION
42 U.S.C. §1983 – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND
FOUTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
(VOID FOR VAGUENESS)

125.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 to 124 above and paragraphs 175 through 202 below as though fully set forth herein.

126.    Collier County Emergency/Executive Order 2020-05 fails to give fair warning of what constitutes a wrongdoing because, among other reasons, persons with disabilities or relevant medical conditions are exempt from the face covering requirement.

127.    Collier County Emergency/Executive Order 2020-05 also lacks objective enforcement standards because, among other reasons: 1) violations of such Emergency Orders are misdemeanors, and Code Enforcement is only permitted by law to impose civil penalties; 2) businesses have no effective way of differentiating between customers who "assert" a disability and those who actually have a condition or disability, 3) compliance with the Order necessarily causes a business owner, operator, or employee to run afoul of the Americans with Disabilities Act and other applicable state and local anti-discrimination laws; and 4) Code Enforcement has unfettered discretion as to who it may cite for violations as among the "owner, operator, manager and employees" of the business.

128.    Collier County Emergency/Executive Order 2020-05 impermissibly delegates policy matters to Code Enforcement investigators and officers and the Code Enforcement Board for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and

discriminatory application.

129.    Persons of common intelligence must necessarily guess at the meaning of the requirements of Collier County Emergency/Executive Order 2020-05, and will necessarily differ as to its application.

130.    For these reasons, Collier County Emergency/Executive Order 2020-05 is unconstitutionally vague and must be so declared by this Court.

AS AND FOR A SECOND CAUSE OF ACTION
42 U.S.C. §1983 – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
(SUBSTANTIVE DUE PROCESS)

131.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 to 130 above and paragraphs 165 through 202 below as though fully set forth herein.

132.    Collier County Emergency Order 2020-05 implicates fundamental rights including the right to breathe the air (which is necessary to sustain life), right to make decisions about one's own healthcare, and right to privacy.

133.    The Order deprives persons of these rights without due process of law.

134.    Moreover, Plaintiffs have a property interest in their respective now charged, pursuant to the Order, with the enforcement a government mandate and the imposition of restrictions on the liberties of its patrons and employees.

135.    The Order constitutes a deprivation of Plaintiffs' property and liberty by forcing Plaintiffs and other business owners to engage in hostile confrontation and conflict with its patrons and employees, which is contrary to Plaintiffs' values and stated business practices.

136.    As illustrated above, this deprivation was undertaken with improper motives (i.e., to purportedly incentivize tourism) and by means that were pretextual, arbitrary and capricious.

AS AND FOR A THIRD CAUSE OF ACTION
42 U.S.C. §1983 – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AND
FOUTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
(EQUAL PROTECTION)

137.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 to 136 above

and paragraphs 146 to 202 below as though fully set forth herein.

138.    Collier County Emergency Order 2020-05 violates the Constitutional guarantee of

equal protection under law, both on its face and as applied.

139.    As written, the Order contains multiple exceptions to the mask-wearing mandate.

The exceptions include certain types of businesses such as restaurants, bars, gyms, places of

worship, barbershops and beauty salons. There is no rationale for discriminating against

businesses who do not fall within these categories.

140.    As written, the Order also contains multiple geographic exceptions to the mask-

wearing mandate. Specifically, Section Six of the Order exempts the "Municipalities" of Collier

County, which are the City of Naples, the City of Marco Island, and Everglades City. The

businesses outside of these incorporated portions of the County are, thus, discriminated against

by the Order by subjecting them to a mandate and penalties that other like-businesses perhaps

across the street or a mile away are not subject to.

141.    As written, the Order only imposes liability upon business owners, operators,

managers and employees but does not subject individuals to liability for their individual refusal

to wear a face covering as required by the Order. This is discriminatory against businesses and

their employees (as opposed to placing liability upon individuals for their own conduct), and also

places an unfair burden on business owners, operators, managers, and employees to stand in the

place of law enforcement.

142.     The Order is being selectively enforced in that, upon information and belief, no other businesses in the County have been cited or issued a Notice of Violation for violation of this Order. Plaintiffs are being targeted for enforcement.

143.     Seed to Table functions serves prepared foods and drinks and provides seating for patrons to consume food and beverages on premises, yet is not being considered exempt from the Order as other businesses providing dine-in food and/or beverage service are.

144.     Upon information and belief, the selective enforcement of this Order is being done with discriminatory intent based upon Plaintiff Oakes being outspoken against a mandatory mask ordinance and against the Commissioners who supported the passage of the Order challenged by this litigation, among other reasons discussed below.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
42 U.S.C. §1983 – VIOLATION OF THE FIRST AMENDMENT TO THE
UNITED STATES CONSTITUTION (RETALIATION)

145.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 to 145 above and paragraphs 150 to 155 below as though fully set forth herein.

146.     Plaintiff Alfie Oakes is a private citizen who has been outspoken on matters of public concern of late.

147.     Among the matters Mr. Oakes has spoken publicly about is the local mandatory mask ordinance. Mr. Oakes spoke in opposition to the proposed mandate at each of the public meetings referenced above at which the matter was discussed.

148.     Emergency/Executive Order 2020-05 was enacted by Defendants, Plaintiffs posted signs on all entrances to each of the businesses notifying all persons entering the premises of the mandate and that if they enter without a mask, they are presumed to be doing so due to a health issue that prevents the wearing of a mask. In addition to providing the required

legal notice, the signage contains images of the three individually-named Defendants with the caption "Socialists".

149.     Upon information and belief, Plaintiffs are being targeted by Defendants for selective enforcement of the Order in retaliation for Mr. Oakes' statements and other First Amendment protected expression described herein.

AS AND FOR A FIFTH CAUSE OF ACTION<br>
42 U.S.C. §1983 – VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (DENIAL OF FREEDOM OF ASSEMBLY AND ASSOCIATION)

150.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 to 149 above and as though fully set forth herein.

151.     Seed to Table has become a popular location for like-minded persons to congregate to discuss political ideas and strategies.

152.     Many local candidates and groups host events and rallies at Seed to Table.

153.     Collier County Emergency/Executive Order 2020-05, both as written and as applied against Seed to Table, is aimed at preventing the assembly of these persons and groups.

154.     The vast majority of the persons who utilize Seed to Table as a location to assemble and engage in a free exchange of ideas are opposed to wearing masks for various reasons including concern for adverse effects on personal health, disbelief in the severity of the COVD-19 virus, belief in the ability of their bodies' own immune system to counteract any viral threat, and opposition to government infringement on liberty and privacy. Requiring these individuals and groups to wear a mask in contravention of their fundamental beliefs in order to assemble is the equivalent of eliminating their right to assemble/associate altogether, since their conviction and commitment to not wearing masks is the very thing that brings them together.

155.     Plaintiff Alfie Oakes regularly participates in these assemblies, discussions, and events.

156.     There is no other local space that is able to accommodate the number of persons that typically gather and provides said space free of charge (and free of masks), so eliminating Seed to Table as a location for persons in opposition to a government-imposed mask mandate to assemble places an unconstitutional limitation on their right to assemble and associate.

<u>AS AND FOR A SIXTH CAUSE OF ACTION</u>
42 U.S.C. §1983 – VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION (UNLAWFUL SEARCH)

157.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 to 156 above and as though fully set forth herein.

158.     The Fourth Amendment protects property owners from unreasonable intrusions onto his property by agents of the government.

159.     On at least the occasions identified hereinabove, agents of the Collier County Code Enforcement Division entered in and upon property owned by Plaintiffs and conducted searches of the premises without a warrant.

160.     These searches are not permitted by law and were undertaken in bad faith as described under the causes of action articulated above.

161.     The searches and resultant citations and notices of violation were aimed at harassing and intimidating Plaintiffs into compliance with the unlawful Emergency/Executive Order 2020-05 and curtailing Plaintiffs' constitutional rights.

162.     These Fourth Amendment violations were undertaken in accordance with the newly promulgated policy of Collier County for enforcement of Emergency/Executive Order 2020-05, and, upon information and belief, in accordance with the explicit directives of the

individually-named Defendants and/or other policymakers of the County.

163.    In some instances, these searches were conducted in spite of the conspicuous presence of "POSTED" signs putting the Division of Code Enforcement and its agents on notice that they were not allowed entry in or upon the premises without a warrant. Florida Statutes Section 933.20-28 provide the method by which officials such as Code Enforcement officers may apply for an obtain an inspection warrant when prohibited entry into a business, but, upon information and belief, no such application was made nor any inspection warrant obtained prior to entry.

AS AND FOR A SEVENTH CAUSE OF ACTION
VIOLATION OF FLORIDA CONSTITUTION ARTICLE 1, SECTION 23
(RIGHT TO PRIVACY)

164.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 163 above as though fully set forth herein.

165.    Article 1 §23 of the Florida Constitution reads, "Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein."

166.    The Florida Supreme Court has interpreted this constitutional provision to mean that "a competent person has the constitutional right to choose or refuse medical treatment and that right extends to all relevant decisions concerning one's health". Singletary v. Costello, 665 So. 2d 1099 (Fla Dist Ct App 1996) *quoting* In re Browning, 568 So. 2d 4 (Fla. 1990).

167.    Strict scrutiny applies to statutes or ordinances that impairs the exercise of a fundamental right in the State of Florida.

168.    This means that the subject ordinance must be necessary to promote a compelling governmental interest and must be narrowly tailored to advance that interest to pass constitutional muster.

169.    Collier County Emergency Order 2020-05 neither promotes a compelling governmental interest nor is narrowly tailored to advance that interest and, thus, must be deemed unconstitutional by this Court.

170.    The governmental interest purportedly served by this Order is promoting tourism and enhancing the feeling of safety of visitors and part-time residents to come to Collier County. Economic interests are not sufficiently compelling to override a fundamental, constitutional right.

171.    To the extent that Defendants will assert that the compelling governmental interest served by the subject Order is protecting public health, that is belied by the numbers cited hereinabove. To reiterate, only 117 residents have died[12] and of all the persons who have contracted the COVID-19 virus, 98.67 percent have survived. Only 2.3 percent of the County's population have contracted the virus. This is not sufficiently compelling to warrant an intrusion into individual liberty and privacy.

172.    The subject Order is not narrowly tailored. Rather, it requires "An owner, manager, employee, customer or patron of a business establishment must wear a face covering while in that business establishment." Though it exempts some businesses (to wit: bars, restaurants, gyms, and barbershops), it does not limit its applicability to persons infected with the COVID-19 virus or those at high risk of adverse health (such as the elderly and those with a co-

---

[12] Upon information and belief, all of the persons who have died have been elderly and/or suffered co-morbidities that contributed to if not caused these persons' deaths.

morbidity), nor exempt persons who are not in close proximity to other persons (i.e., maintaining the recommended six feet of "social distance").

173.   In addition, the County had agreed upon a less intrusive means of curtailing the spread of COVID-19, to wit: an educational campaign to serve this end/interest, but *never actually undertook any educational measures prior to implementing a sweeping mandate* despite a downward trend in the rate of infection in the intervening weeks.

AS AND FOR AN EIGHTH CAUSE OF ACTION<br>VIOLATION OF FLORIDA CONSTITUTION ARTICLE 1, SECTION 9 (DUE PROCESS)

174.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 173 above as though fully set forth herein.

175.   Article 1 §9 of the Florida Constitution reads, "No person shall be deprived of life, liberty or property without due process of law...".

176.   This due process clause protects the individual against the arbitrary and unreasonable exercise of governmental power. *See, e.g.*, Noel v. State, 191 So. 3d 370, 373 (Fla. 2016).

177.   Emergency/Executive Order 2020-05 is both arbitrary and unreasonable.

178.   As articulated by Commissioner McDaniel and quoted hereinabove, the Board of County Commissioners did not follow its usual protocol in enacting the challenged Order/Ordinance. Thought it had ample opportunity to do so, it did not deploy its staff to gather data and did not make the necessary legislative findings to underpin its decision to dictate to individuals and businesses how to best protect their own health and/or that of its customers.

179.   The subject Order is also violative of Article 1 §9 of the Florida Constitution because it is overly vague, which lends itself to arbitrary enforcement at an officer's discretion

in violation of applicable law. *See, e.g.*, <u>Davis v. Gilchrist County Sheriffs Office</u>, 280 So. 3d 524, 532 (Fla. 1st DCA 2019).

<u>AS AND FOR AN NINTH CAUSE OF ACTION</u>
VIOLATION OF FLORIDA STATUTES SECTION 125.66

180.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 179 above as though fully set forth herein.

181.     Section 125.66 of the Florida Statutes prescribes the procedures Counties must follow to enact ordinances, inclusive of emergency ordinances.

182.     The regular procedure requires that at least 10 days' notice be given to the public prior to the meeting of the Board of County Commissioners at which the proposed ordinance will be considered.

183.     In order for the above-stated notice requirement to be dispensed with, 4/5ths of the membership of the Board must vote "declaring that an emergency exists and that the immediate enactment of said ordinance is necessary".

184.     Defendants failed to adhere to any of the foregoing applicable procedures, and therefore the subject Order is null and void and must be so declared by this Court.

185.     To the extent that this Court may find that notice requirements were adhered to in terms of the timing of the notice, actual notice was never given of any emergency Order or Ordinance. Rather, the only actual notice given was of the Board of County Commissioner's intent to consider directing the County Attorney to bring back an Ordinance for public hearing and consideration by the Board at a future meeting. In this way, too, Defendants circumvented notice requirements and thereby deprived the public of a meaningful opportunity to be heard in violation of law.

<u>AS AND FOR AN TENTH CAUSE OF ACTION</u>
VIOLATION OF COLLIER COUNTY CODE OF ORDINANCES SECTIONS 2-36 and 2-41

186.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 185 above as though fully set forth herein.

187.    Collier County has established its own set of ordinances that govern the actions and procedures of its Board of County Commissioners.

188.    Just as Defendants abandoned their duties and obligations placed upon them by State law, they likewise disregarded applicable local ordinances in enacting the subject Order.

189.    Pursuant to Section 2-36(d)(1) of the Collier County Code of Ordinances, the Board may not take action on any item not set forth on the published agenda without the consent of the majority of the Board. Thus, the Board exceeded its lawful authority by voting upon an Emergency Order or Ordinance at its July 14, 2020 meeting since the agenda only gave notice of a discussion regarding a "Recommendation that the Board direct the County Attorney to advertise and bring back for a Special Hearing an ordinance" and **<u>not</u>** of the enactment of an emergency order or ordinance that day.

190.    Thus, the July 21, 2020 meeting that called for reconsideration of this item but resulted in a vote on an already proposed "Emergency/Executive Order" was unlawful by extension in that it related back to an act of the Board that was not properly noticed and, thus, in contravention of applicable law.

191.    In addition, the convening of the July 21, 2020 failed to comport with the requirements of Section 2-41 of the Collier County Code of Ordinances, which allows for any member of the Board of County Commissioners who voted in the majority to call for reconsideration if and only if made under one of the following circumstances: 1) the motion for reconsideration is made prior to the adjournment of the meeting at which the matter was

originally voted upon; or, 2) at a regular meeting following the meeting at which the matter was originally voted upon if certain factors enumerated in the statute are met. There is no provision of law that allows for the procedures set forth in Section 2-41 to be waived.

192.    As none of the requirements for reconsideration of the County's prior rejection of the Order that is the subject of this litigation were met, the vote of approval upon reconsideration is null and void and Emergency Order 2020-05 must be declared by this Court to be invalid.

AS AND FOR AN ELEVENTH CAUSE OF ACTION
VIOLATION OF FLORIDA STATUTES CHAPTER 252, SECTIONS 38 and 46

193.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 192 above as though fully set forth herein.

194.    To the extent that Defendants assert that what they enacted was an Emergency Order pursuant to Chapter 252 of Florida Statutes and they therefore are somehow exempt from the laws and ordinances cited herein as having been violated, that assertion must fail as a matter of law for the following reasons.

195.    Although the County did declare a State of Emergency on March 16, 2020, upon information and belief, that state emergency has never been renewed. Thus, pursuant to §252.38(3)(a)(5), Florida Statutes, the state of emergency expired seven (7) days after it was declared.

196.    Even if the local state of emergency was renewed and/or to the extent that the County will contend that it has the authority to circumvent the laws and ordinances asserted herein and enact emergency measures based upon the state of emergency declared by the Governor, such state of emergency only permits political subdivisions to waive certain "procedures and formalities" enumerated in Section 252.38(3)(a)(5). The subject matter of the this litigation is not among those enumerated functions of local government.

197.     Defendants lacked authority to enact an emergency order as defined by Chapter 252, Florida Statutes.

AS AND FOR A TWELFTH CAUSE OF ACTION
VIOLATION OF COLLIER COUNTY CODE OF ORDINANCE SECTIONS 2-39 and 38-68

198.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 197 above as though fully set forth herein.

199.     Section 38-68 of the Collier County Code of Ordinances enumerated the limited, specific actions that *individual officials* of the County may take and/or authorize (i.e., "emergency orders") when under a state of emergency.

200.     It is clear, based upon a reading of the statute, that emergency orders are reserved for occasions when action must be taken but a convening of the Board of County Commissioners is not possible.

201.     Pursuant to Section 2-39 of the Collier County Code of Ordinances, actions of the Board of County Commissioners must be in the form of a resolution or ordinance.

202.     Emergency Orders (and Executive Orders, which clearly would never be a Board function just based on nomenclature alone) are not a legally authorized function of the Board of County Commissioners. For this reason, Emergency/Executive Order 2020-05 is null and void, and must be so declared by this Court.

AS AND FOR A THIRTEENTH CAUSE OF ACTION
TRESPASS

203.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 20 above as though fully set forth herein.

204.     At all relevant times, Plaintiffs were and are the owner or were rightfully possessed of the subject properties.

205.     The County, through its Code Enforcement Officers, entered the premises to conduct a search without a warrant, and without the authority of the Plaintiffs to enter the premises, and in direct defiance of the signage visibly posted at every entrance prohibiting their entry.

206.     The Plaintiffs have been damaged by such unauthorized entry by the County.

207.     As a result, the County is liable to Plaintiffs for compensatory damages in an amount to be determined at trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(i)      Declaratory Judgment declaring Collier County Emergency/Executive Order 2020-05 unconstitutional and invalid based upon all or any of the constitutional provisions and statutes asserted as causes of action herein; and,

(ii)     An Order permanently enjoining the County, inclusive of the Division of Code Enforcement and the Sheriff's Department, from enforcing Emergency/Executive Order 2020-05, and any portion thereof; and,

(iii)    An Order awarding attorneys' fees and costs to Plaintiffs pursuant to 42 U.S.C. §1988 or any other applicable statute; and,

(iv)     An Order awarding compensatory damages for trespass; and

(v)      Such other and further relief as this Court may deem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated:  August 5, 2020

Respectfully submitted,

STEVEN J. BRACCI, PA

_/s/ Steven J. Bracci_____
Steven J. Bracci (Bar No. 157562)
9015 Strada Stell Court, Suite 102
Naples, Florida  34109
Ph: (239) 596-2635
e-mail:  steve@braccilaw.com
*Attorney for Plaintiffs Francis A. Oakes, III, Oakes Farms, Inc. d/b/a Seed to Table, and Seed to Table, LLC*

43

## **VERIFICATION**

I, FRANCIS A. OAKES, III, individually, and as President of OAKES FARMS, INC. d/b/a Seed to Table, and as Manager of SEED TO TABLE, LLC, verify under penalty of perjury that the matters alleged in the foregoing Complaint are true and correct, except as to those matters alleged upon information and belief, and as to those matters, I believe them to be true.

Executed on August 5, 2020.

_____
FRANCIS A. OAKES, III